# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **JOSEPH ADOLPHUS BRAGG, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 09 C 3017** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **Magistrate Judge Morton Denlow** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Claimant Joseph Adolphus Bragg, Jr. ("Claimant") brings this action under 42 U.S.C. § 405(g), seeking reversal or remand of the decision by Defendant Michael J. Astrue, Commissioner of Social Security ("Defendant" or "Commissioner"), denying Claimant's application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Claimant raises the following issues: 1) whether the ALJ properly favored the testimony of the medical examiner ("ME") over the evidence produced by Claimant's treating physician in his determination of Claimant's residual functional capacity ("RFC") (and in posing hypothetical questions to the Vocational Expert); 2) whether the ALJ failed to consider all of Claimant's impairments in combination; and 3) whether the ALJ's credibility finding regarding Claimant's testimony was patently wrong. For the following reasons, the Court denies Claimant's motion for summary judgment and grants the Commissioner's cross-motion for summary judgment.

# I. BACKGROUND FACTS

## A.    Procedural History

Claimant initially applied for DIB and SSI on January 23, 2006, alleging a disability onset date of March 1, 2005.  R.  58-59, 65.  The Social Security Administration ("SSA") denied his applications on April 18, 2006. R. 58-59.  Claimant then filed a request for reconsideration, which was denied on November 2, 2006.  R. 88, 60-61.  Thereafter, Claimant requested a hearing before an ALJ.  R. 95.

On March 18, 2008, Administrative Law Judge Joseph P. Donovan, Sr. ("ALJ") presided over a hearing at which Claimant appeared with his attorney, Ellen Hanson.  R. 8-52.  In addition to Claimant, Dr. William H. Newman, a medical expert, and Leanne Carey, a vocational expert, also testified.  *Id.*  On September 23, 2008, the ALJ issued a decision finding Claimant was not disabled under the Social Security Act. R. 62-76.  Specifically, the ALJ found Claimant had "the residual functional capacity to perform a limited range of light work" and was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy."  R. 74, 76.

Claimant then filed for review of the ALJ's decision to the Appeals Council, which denied Claimant's request on April 9, 2009.  R. 4-6.  On June 8, 2009, the Appeals Council set aside this earlier action to consider additional information.  R. 1-3.  Upon considering the additional information, the Appeals Council again denied Claimant's request for review.  *Id.* Therefore, the ALJ's decision became the final decision of the Commissioner.  Claimant subsequently filed this action for review pursuant to 42 U.S.C. § 405(g).

## B.    Hearing Testimony – March 18, 2008

### 1.    Joseph Adolphus Bragg, Jr. – Claimant

At the time of the hearing, Claimant was 38 years old.  R. 12.  Claimant's highest educational level is a GED.  *Id.*  Claimant's most recent employment as a union laborer ended in February 2005, when he stopped working due to "problems with [his] arms and legs and pain . . . from the neck down [his] arms and legs."  R. 13.  He is financially supported by his family.  *Id.*

Claimant testified that he is able to sit for ten or fifteen minutes before becoming uncomfortable.  R. 14.  At that point, he lies down, gets into a different position, or walks around.  *Id.*  He is able to stand for "five minutes [or] thirty minutes," and frequently must grab hold of something to support himself.  *Id.*  However, he does not use a cane or other assistive walking device.  *Id.*  Claimant testified that he is able to walk approximately 100 feet, but he is unable to crouch, bend at the hip, bend at the knees, or crawl.  R. 15.  He stated that he is unable to raise his arms above elbow to shoulder without discomfort.  *Id.*  Claimant testified that he is not able to engage in any type of pushing or pulling.  R. 17.

Claimant is able to reach out to the side or forward, and can make a fist with either hand.  R. 16.  He is able to lift five or ten pounds without pain, and would be able to carry a gallon of milk–which weighs approximately eight pounds–about twenty-five feet.  R. 16, 17.  However, he testified he drops things "quite often."  R. 21.  Claimant is physically able to shower, dress himself, make his bed, and use small items such as a shaver or a toothbrush.  R. 18.  He did not report problems with maintaining concentration.  R. 19.

Claimant noted pain and numbness in his fingers.  R. 21.  Claimant also stated that

"they" (unspecified doctors) wish to do surgery on his cervical spine, but have not identified what procedure is appropriate. *Id*. Claimant noted that these unspecified doctors are waiting for him to get on Medicare, as such surgery "could get expensive." R. 22.

According to Claimant, he does as much as he can to work. R. 34. However, he claimed that he can't climb stairs and can't "lift stuff and carry it," and, when he tries, he "end(s) up laying down on a bed for three or four days before I can get up and move again because I get in so much pain I lose control of my legs, my arms." *Id*. Claimant also noted that his doctors have diagnosed him with carpal tunnel syndrome in both hands. R. 38.

Claimant has lost his driver's license on account of three moving violations. R. 35. Even with a driver's license, however, he wouldn't drive on account of "the medications and the condition I'm in." *Id*.

Claimant testified that he does not use any "street drugs." R. 36. Claimant testified that he is taking Fentanyl, 50 mg a day; Norco 10325, six times a day; Valium, 10 mg at night for sleep; and Flexeril, either 10 or 25 mg, for sleep. R. 39. Claimant noted that he sleeps for "four [or] five hours, tops," and takes twelve hours to get six hours of sleep. R. 40.

### 2. Dr. William H. Newman – Medical Expert ("ME")

Dr. William H. Newman, an orthopedic surgeon, testified as a medical expert. R. 23, 132. The ME noted that Claimant's major physical problem is his cervical spine. R. 24. The ME opined, however, that surgical intervention in 1990 was successful, and Claimant no longer has locked facets. *Id*. The ME testified that Claimant does have other pathology

4

in his neck that was not addressed by the surgery: a bulging disc at C2 and C3 and some posterior spurs at C7. *Id*. The ME believes the C2 disk partly explains Claimant's right shoulder pain and is reasonably related to any pain Claimant might have down the right arm to his fingers, as well as numbness. R. 25. The ME further testified that Claimant has moderate right carpel tunnel syndrome. *Id*. The ME found a nerve latency of 5.1 milliseconds in Claimant's right hand, which exceeds the normal latency range of 3.6 - 3.8 but falls short of 7 or 8 milliseconds, which would be considered a marked impairment. R. 26-27. Consequently, the ME opined that Claimant experiences a "little numbness and a little clumsiness." R. 27. The ME noted that this level of carpal tunnel does not preclude constant light use or handling of small objects, or strenuous non-continuous light use. R. 28. Fine manipulation, strenuous grasping, or twisting and gripping with the right hand would be limited to one third of the day. R. 31-32.

The ME further noted that the EMG showed no cervical or lumbar radiculopothy. R. 28. However, this did not preclude the possibility of occasional numbness in Claimant's right arms, on account of the C2 disk. R. 28. Considering each of these issues "together in combination," the ME opined that Claimant did not equal the severity listing. R. 30.

The ME testified that Claimant would be able to lift, push, and pull, twenty pounds occasionally and ten pounds frequently. R. 31. The ME found Claimant able to stand and walk at least six hours in an eight-hour day, or sit six hours in an eight-hour day. *Id*. Constant overhead work would be restricted. R. 32. The ME noted no limitations regarding kneeling, crouching, crawling, stooping, or bending. R. 33.

5

The ME also found evidence of paresis in Claimant's feet. R. 36. The ME suspected this paresis might have been caused by alcohol use, basing this hypothesis on a neurologist smelling alcohol on the Claimant, as well as Claimant's alcohol seizures on April 1, 2006. *Id*. An EMG of both lower extremities did not show a polyneuropathy. R. 38. The ME also noted that Claimant has high blood pressure and borderline hypertension. R. 37.

The ME testified that his conclusions were based primarily on the myelogram and EMG in exhibit 30F and the MRI in exhibit 1F. R. 41-42. The ME stated that there was a lack of objective physical evidence to explain the large amount of narcotics prescribed to Claimant. R. 42. He noted that the EMG performed on October 19, 2006 did not exhibit changes "substantially different" from that performed on October 18, 2005, and did not show evidence of denervation or support C5/T1 or L3/S1 radiculopothy on either side. R. 45. The ME noted that the EMG would be the authoritative medically determinable technique to determine a neurological deficit, and that the EMG did not indicate any polyneuropathy. *Id*.

### 3. Leanne Carey – Vocational Expert ("VE")

Leanne Carey testified as a vocational expert. R. 46. The VE noted that Claimant's position as a union laborer had heavy physical demands, with a Specific Vocational Preparation ("SVP")[1] of 2. R. 47. Claimant was also self-employed doing automobile repair, which is considered skilled work with a SVP of 7. *Id*. The ALJ presented the VE with a

---

[1] A SVP classifies how long it would normally take for particular work to be learned to a level of average performance. A SVP of 2 indicates that the work can normally be learned within 1 month, and is considered unskilled labor. A SVP of 7 indicates that the work can normally be learned within 2 to 4 years. http://www.occupationalinfo.org/appendxc_1.html#II.

detailed hypothetical person based on the ME's proposed restrictions. R. 47-48. The VE opined that this hypothetical person would not be able to perform Claimant's past relevant work. R. 48. The VE testified that the most appropriate positions would be "light, unskilled positions" such as a counter clerk, office helper, or information clerk. R. 48-49. The VE explained that these jobs are all available in the Chicago metro area. R. 48.

## C.    Medical Evidence

### 1.    1990 Neck Operation at Northwestern Memorial Hospital

Claimant's medical records date back to a January 1990 neck operation. R. 519. Following the operation, Claimant was kept in a halo for three months, and experienced discomfort upon the halo's removal in April 1990. R. 531. A contemporaneous April 1990 CT myelography noted there was no evidence of disk herniation, the spinal cord appeared normal, there was no foraminal stenosis, and there was a slight offset of the left uncinate joint at C7-T1. R. 527.

### 2.    Medbrook Medical Associates

Claimant's medical records show no treatment for neck complaints between 1990 and the alleged onset date of March 2005. In March 2005, Claimant was seen for right shoulder pain. R. 382. Examination by Dr. Kelly Nelson shows that Claimant had a good range of motion, and an X-ray revealed no obvious acute disease. R. 384-85. The report also noted that Claimant "smelled acutely of alcohol," prompting "concerns about long term abuse." R. 384. Claimant was given a sling and prescribed a Medrol Dosepak and Lotrab. *Id*. Claimant returned in April 2005, claiming the sling made his shoulder pain worse and that

the Lotrab was not helping.  R. 382.  Claimant was advised to start on physical therapy and Trilisate.  *Id*.  Claimant's request for narcotics was denied.  *Id*.

### 3.     West Virginia University ("WVU") Department of Orthopedics

In June 2005, Claimant sought treatment at WVU for right shoulder pain.  R.  297.  Shoulder X-rays showed a dislocation of Claimant's right shoulder.  R. 303.  In July  2005, subsequent X-rays of the right shoulder were "essentially negative" and films of the cervical spine were "compatible with a previous C7-T1 fusion."  R. 215.

In  August  2005,  Dr.  Sanford  Emery  ("Dr.  Emery")  reviewed  the  cervical  MRI, examined Claimant and found he appeared to be experiencing acute pain syndrome around his neck.  R. 210-11.  Based on MRI findings, however, he did not believe Claimant was a candidate for surgery, as there was no mechanical obstruction or significant narrowing of his spinal canal.  R. 211.  Dr. Emery recommended physical and occupational therapy.  *Id*.

On November 2, 2005, Claimant returned to the facility, claiming neck, thoracic, and back pain.  R. 291.  On November 22, 2005, Claimant was seen by Dr. Alvaro R. Gutierrez ("Dr. Gutierrez") in the neurology department.  R. 231.  Dr. Gutierrez treated Claimant's complaints of pain by altering his combinations of medication.  *Id*.

In February 2006, Claimant visited Dr.  George Bal ("Dr.  Bal"), claiming pain in his shoulder, neck, and upper back, with occasional symptoms radiating into his arm.  R. 209.  Dr. Bal informed Claimant that, although he doubted arthroscopy would help his neck and back pain, such surgery might help his shoulder pain.  R. 209.

### 4.     Monongalia General Hospital

In February 2006, Claimant went to the emergency room complaining of lower back pain and difficulty walking. R. 341-43. The attending physician, Dr. Sanjay Bharti ("Dr. Bharti"), noted that he did not "know how real" the lower back pain was. R. 344. He also noted that Claimant smelled of alcohol, had high alcohol levels, and left the facility against medical advice. *Id.* Later that day, Claimant saw Dr. Gutierrez. R. 347. Claimant admitted to drinking a 12-pack of beer daily. *Id.* Dr. Gutierrez declined to prescribe additional narcotics because of Claimant's "history of concomitant use of narcotics and alcohol." *Id.*

On April 4, 2006, Dr. Arsenio Navarro ("Dr. Navarro") ordered a lumbar MRI, which showed minimal levoscoliosis and minimal degenerative changes at the level of L5. R. 349. A cervical spine series indicated that the cervical spine appeared normal, with Dr. Navarro noting the post-surgical changes at the posterior elements of T1. R. 350. On April 23, 2006, an MRI of the dorsal spine was performed and the results were negative. R. 352.

### 5. Evaluation by State Agency Physicians

In April 2006, Dr. Thomas Lauderman, D.O. ("Dr. Lauderman"), reviewed the record on behalf of the state agency, and discussed Claimant's history, test results, and clinical results. R. 252. Dr. Lauderman opined that Claimant could perform a range of light work. R. 246-47. In October 2006, Dr. Cindy Osborne, D.O. ("Dr. Osborne"), reviewed the record on behalf of the state agency and also opined that Claimant could perform a range of light work. R. 398-99.

In October 2006, Tina Yost, Ed.D., examined Claimant at the request of the state agency and performed a psychological evaluation. R. 409-11. She diagnosed alcohol dependence and noted that Claimant self-reported chronic pain from his physical impairments. R. 411. She found Claimant's prognosis was "fair" and that his concentration, persistence, pace, and immediate memory were within normal limits. *Id.* She noted that his recent memory was "markedly deficient." *Id.*

### 6. Treatment at United Hospital

In May 2006, Dr. Marc A. Valley ("Dr. Valley") saw Claimant and noted complaints of chronic neck pain and parasthesias in all four extremities. R. 329. A general physical examination, however, "reveal[ed] a patient in no acute distress." R. 331. A back exam suggested a decreased range of motion and significant crepitance.[2] *Id.* Mild muscle loss was

---

[2]Crepitance is "a clinical sign in medicine characterized by a peculiar crackling, crinkly, or grating feeling or sound under the skin, around the lung, or in the joints." http://www.medterms.com/script/main/art.asp?articlekey=12061

noted.  *Id*.  Dr. Valley also reviewed Claimant's February 2005 MRI and found cord signal abnormality and diagnosed cervical disc displacement with myelopathy and gait disorder. R. 332.  Dr. Valley referred Claimant to Dr. Richard Douglas ("Dr. Douglas") to assess whether the surgical fusion was stable and whether there was a need for surgery.  *Id*.

In September 2006, Dr. Douglas diagnosed Claimant as having cervical pain with extremity paresthesias.  R. 451, 454.  Dr. Douglas found that Claimant exhibited "exaggerated pain behaviors."  R. 453.  September and October 2006 EMGs were abnormal and supportive of moderate right carpal tunnel syndrome.  R. 459.  However, the studies did not show evidence of denervation and "were not supportive of CS-T1 or L3-S1 radiculopathy on either side."  *Id*.

### 7.     Miscellaneous Treatment Records From October 2006 - August 2007

An October 2006 RMG performed by Dr. Shiv Navada verified right carpal tunnel syndrome.  R. 459.  In March 2007, Dr. Beverly Epstein performed a cervical myelogram at the WVU Spine Center, which showed defects involving the thecal sac at three levels, and neural foraminal narrowing at two levels.  R. 483-84.  There was "no evidence for cord compression or distortion" at any level.  *Id*.

In August, a cervical MRI was deemed "negative" after it showed "no focal disc herniation or spinal stenosis," "no significant impingement upon the neural elements," and a "normal" cervical cord.  R. 436.

### 8.    Dr. Thomas Zabiega – Neurologist

Claimant started seeing Dr. Thomas Zabiega ("Dr. Zabiega"), a neurologist, on June 15, 2007.  R. 473.  Following this initial appointment, Dr. Zabiega diagnosed Claimant with cervical disk disease, lumbar disk disease, carpal tunnel syndrome, and a right rotator cuff tear.  R. 474.  Dr. Zabiega completed a function capacities questionnaire and assessment indicating that Claimant could lift up to 25 pounds occasionally, sit four hours total a day, and walk two hours total a day.  R. 476.  Dr. Zabiega also noted Claimant was able to use his hands for simple grasping, pushing and pulling arm controls, and fine manipulation.  *Id*.  Dr. Zabiega found Claimant was unable to squat, crawl, or climb.  R. 477.  However, he found Claimant was able to bend occasionally and reach frequently.  *Id*.  He found no limitations regarding the use of Claimant's feet for repetitive motions.  *Id*.  He found Claimant's ability to sustain concentration and attention was moderately impaired.  R. 478.

On September 7, 2007, Dr. Zabiega wrote a new assessment with much more restrictive limitations.  R. 537-41.  He noted Claimant was incapable of even low stress jobs, on account of his "constant severe pain and associated inability to concentrate."  R. 539.  In this second assessment, Dr. Zabiega estimated Claimant could not walk a city block without rest or severe pain, could not sit for more than 15 minutes at one time, and could not stand for more than 15 consecutive minutes.  *Id*.  He also found Claimant was unable to lift and carry 10 pounds in a "competitive work situation."  R. 540.  Dr. Zabiega estimated Claimant was likely to be absent from work more than four days per month, on account of his impairments.  R. 541.  Dr. Zabiega's two intervening treatment notes document Claimant's

complaints and medications, but do not note additional objective clinical findings.  R. 542.

On October 15, 2007, Dr. Zabiega wrote a letter stating that Claimant's lack of insurance prevented "a more thorough evaluation and treatment which he may benefit from." R. 553.  Specifically, Dr. Zabiega opined that Claimant would benefit from an MRI of the cervical and lumbar spine and EMG and nerve conduction study to evaluate Claimant's carpal tunnel syndrome, and "possible" lumbar radiculopathy.  *Id*.  He also thought Claimant should be evaluated by orthopedic and hand surgeons "to see if he would benefit" from injections or surgery.  *Id*.  Dr. Zabiega saw Claimant again in November 2007, December 2007, and February 2008, each time noting that Claimant continued to complain of severe pain, while remaining neurologically "unremarkable."  R. 565-66.

In February 2008, Dr. Peter Analytis performed an EMG and nerve conduction study of the lower extremities at the request of Dr. Zabiega.  R. 567-69.  The EMG showed "no evidence for acute or denervative lumbosacral radiculopathy or plexopathy."  R. 569.  Clinical examination also showed unremarkable strength in all extremities and symmetrical reflexes, except for the right ankle, which was "poorly elicitable."  R. 568.

### 9.       Treatment and Evaluations Submitted Post-Hearing

Following Claimant's hearing before the ALJ, Claimant's counsel submitted the results of an MRI of the cervical spine and an MRI of the lumbar spine, each of which was initially performed on February 13, 2008.  R. 604-7.  Counsel also submitted a new assessment from Dr. Zabiega written on March 25, 2008, which detailed significant limitations that differed somewhat from his earlier assessments.  R. 581-86.  Claimant also submitted a letter from

Dr. Zabiega written on January 15, 2009, which noted that Claimant's severe lumbar and cervical radiculopathy prevented him from performing "any type of work." R. 623. In this letter, Dr. Zabiega opined that Claimant would need physical therapy and "possible surgery" in the future. *Id*. Dr. Zabiega concluded that Claimant "should be considered permanently disabled." *Id*.

## D.    The ALJ's Decision – September 23, 2008

Following a hearing and a review of the medical evidence, the ALJ rendered an unfavorable decision upholding denial of Claimant's application for DIB and SSI. R. 65-76. The ALJ reviewed Claimant's application under the familiar five-step sequential analysis. R. 67-74; *see infra*, Part II, B. At step one, the ALJ found Claimant had not engaged in substantial gainful activity since March 1, 2005, the alleged onset date. R. 67. At step two, the ALJ found Claimant had the severe impairments of degenerative disc disease of the lumbar spine, status post spinal fusion of the cervical spine, degenerative joint disease of the right shoulder, and carpal tunnel syndrome. *Id*. At step three, the ALJ found Claimant did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. R. 68. The ALJ then considered Claimant's residual functioning capacity ("RFC")[3] and found Claimant is capable of performing "a limited range of light work." R. 74.

_____

[3]A residual functional capacity assessment is the most that a person can do despite their physical and mental limitations. The Social Security Administration assesses a person's residual functional capacity based on all of the relevant evidence in his or her case record. 20 § C.F.R.404.1545(a).

In assessing Claimant's RFC, the ALJ considered all of Claimant's symptoms and the extent to which those symptoms could "reasonably be accepted as consistent with the objective medical evidence and other evidence." R. 69. This evaluation was based on the medical evidence of record, the Claimant's testimony, the State agency opinions, and the opinion testimony of the ME. R. 74. The ALJ found Claimant's impairments could reasonably be expected to produce his symptoms, but that Claimant's statements "concerning the intensity, persistence and limiting effects of [those] symptoms are not credible." R. 70. The ALJ noted that Claimant's "conservative and limited" medical record did "not reflect the type of medical treatment one would expect for a totally disabled individual or for one with symptoms as alleged by the claimant." R. 70.

The ALJ noted that, on February 8, 2005, prior to the alleged disability onset date, Claimant sought emergency room treatment for uncontrolled hypertension, alcoholism, and recurrent seizures. *Id.* On this visit, laboratory tests showed positive results for marijuana and barbiturates. *Id.* The ALJ detailed subsequent visits to multiple neurologists, neurosurgeons, and pain management specialists; treatment notes from these visits indicated significant subjective complaints of pain, but "minimal" clinical findings upon physical examination. R. 71. The ALJ also noted that, "More importantly, [the medical reports] fail to show any marked change or significant deterioration in the Claimant's condition." *Id.*

The ALJ noted that, since June 15, 2007, Claimant has been receiving treatment from Dr. Zabiega. *Id.* The ALJ described the medical assessment of Dr. Zabiega as indicating "extreme functional limitations." R. 73. However, the ALJ noted that Dr. Zabiega issued

15

his first assessment of the Claimant's abilities on July 5, 2007, "after only two office visits." *Id*. Further, the ALJ found that the "extreme limitations" described on Dr. Zabiega's RFC questionnaire, completed on March 25, 2008, were incompatible with the minimal diagnostic test results and his own objective clinical findings. *Id*. Consequently, the ALJ found that the weight given to Dr. Zabiega's opinions is "neither 'great' nor 'controlling.'" *Id*.

Rather, the ALJ gave "great weight" to the opinion testimony of the ME, who "reviewed the record in its entirety and also had the opportunity to observe and directly hear the claimant's testimony as to his abilities and limitations and to ask clarifying questions." R. 73-74. The ALJ discussed the ME's assessment, addressing those abilities described in the ME's physical RFC as "consistent with light residual functional capacity." R. 74. The ALJ concluded that Claimant was able to perform a limited range of light work. *Id.*

At step four, the ALJ found Claimant was unable to perform any past relevant work. *Id.* At step five, the ALJ found there are jobs that exist in significant numbers in the national economy that Claimant could perform. R. 75. Thus, the ALJ concluded Claimant was not disabled under the Social Security Act. R. 76.

## II.  LEGAL STANDARDS

### A.  Standard of Review

The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  A decision by an ALJ becomes the Commissioner's final decision if the Appeals Council denies a request for review.  *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000).  Under such circumstances, the district court reviews the decision of the ALJ.  *Id.*  Judicial review is limited to determining whether the decision is supported by substantial evidence in the record and whether the ALJ applied the correct legal standards in reaching his decision.  *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A "mere scintilla" of evidence is not enough.  *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).  Even when there is adequate evidence in the record to support the decision, however, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the conclusion."  *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008).  If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand.  *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

Though the standard of review is deferential, a reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision.  *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008).  It may not, however, "displace the ALJ's judgment by

reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Thus, judicial review is limited to determining whether the ALJ applied the correct legal standards and whether there is substantial evidence to support the findings. *Nelms*, 553 F.3d at 1097. The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

**B.    Disability Standard**

Disability insurance benefits are available to a claimant who can establish she is under a "disability" as defined in the Social Security Act. *Liskowitz v. Astrue*, 559 F.3d 736, 739-40 (7th Cir. 2009). "Disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is under a disability if she is unable to do her previous work and cannot, considering her age, education, and work experience, partake in any gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2)(A). Gainful employment is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

A five-step sequential analysis is utilized in evaluating whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(i-v). Under this process, the ALJ must inquire, in the following order: 1) whether the claimant is engaged in substantial gainful activity; 2) whether the claimant has a severe impairment; 3) whether the claimant's impairment meets or equals a

listed impairment; 4) whether the claimant can perform past relevant work; and 5) whether the claimant is capable of performing other work. *Id.* Once the claimant has proven he cannot continue his past relevant work due to physical limitations, the ALJ carries the burden to show that other jobs exist in the economy that the claimant can perform. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

## III. DISCUSSION

Claimant raises the following issues in support of his motion: 1) whether the ALJ improperly favored the testimony of the ME over the evidence produced by Claimant's treating physician in his determination of Claimant's RFC (and in posing hypothetical questions to the Vocational Expert); 2) whether the ALJ failed to consider all of Claimant's impairments in combination; and 3) whether the ALJ's credibility finding regarding Claimant's testimony was patently wrong. The Court addresses each in turn.

**A.     The ALJ Reasonably Weighed the Various Medical Opinions and Evidence.**

An ALJ makes a RFC determination by weighing all the relevant evidence of record. 20 C.F.R. § 404.1545(a)(1); SSR 96-8p. In doing so, he must determine what weight to give the opinions of the claimant's treating physicians. 20 C.F.R. § 404.1527. A treating physician's opinion is entitled to controlling weight if it is supported by the medical findings and not inconsistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). However, so long as the ALJ "minimally articulates his reasons," he may discount a treating physician's opinion if it is inconsistent with that of a consulting physician or other substantial medical

evidence.  *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004).  An ALJ may also discount a treating physician's medical opinion if it is internally inconsistent.  *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir.  2007).

Here, the ALJ extensively detailed the reasons why he did not give "great" or "controlling" weight to the "opinions, reports, and conclusions" of Dr. Zabeiga.  R. 73.  The ALJ pointed out that Dr.  Zabiega issued his first assessment of Claimant's abilities and limitations on July 5, 2007, after only two office visits.  *Id*.  The ALJ then noted that, on September 7, 2007–just three months later–Dr.  Zabiega issued a subsequent assessment of Claimant's abilities and limitations.  *Id*.  The differences between the July and September assessments are striking.  R. 473-79, 537-41.  In his July assessment, Dr.  Zabiega opined that Claimant could lift up to 25 pounds occasionally, sit four hours total a day, and walk two hours total a day.  R. 476.  In his September assessment, Dr.  Zabiega opined that Claimant could not walk a city block without rest or severe pain, could not sit for more than 15 minutes at one time, and could not stand for more than 15 minutes at one time.  R.  539.  Dr.  Zabiega did not account for this supposed rapid physical deterioration, as his two intervening treatment notes offer no additional clinical findings.  R.  542.  Also, in Dr.  Zabiega's September evaluation, he notes that the highly restrictive limitations apply back to February 2005–a full two years *prior* to Dr.  Zabiega's own initial, less restrictive analysis.  R. 550.  Once again, no explanation is presented for this curious, contradictory retroactive evaluation.

Additionally, Dr. Zabiega's inconsistent evaluations regarding Claimant's limitations contradict those provided by the other physicians and evidence in the record.  At the hearing,

the ME provided the ALJ with a detailed evaluation of Claimant's ability to work, with limited restrictions.  R.  31-34.  The ALJ also relied on the opinions of the "State agency consultants who similarly assessed a RFC that would allow for the performance of substantially the full range of work at the light exertional level."  R.  74.  These three assessments directly contradict the assessments offered by Dr.  Zabiega.  The ALJ also comprehensively reviewed the evaluations and test results from Claimant's past medical professionals, finding no objective findings to support Dr.  Zabiega's evaluation.  R.  70-73.

In assessing Claimant's RFC, the ALJ ultimately gave great weight to testimony of the ME, "who reviewed the record in its entirety and also had the opportunity to observe and directly hear the claimant's testimony as to his abilities and limitations and to ask clarifying questions."  R.  74.  Claimant attacks the ME's evaluation, claiming that, under *Sarchet v. Chater*, 78 F.3d 305 (7th Cir.1996), reversal is required when the decision of the trier of fact is unreliable due to serious mistakes or omissions.  In *Sarchet*, however, there were a "substantial number of illogical or erroneous statements that [bore] materially on [the ALJ's] conclusion that [the claimant] is not totally disabled."  *Id.*  at 307.  These errors included "a pervasive misunderstanding of the disease," mistaken comprehension of medical terms, "a number of unfounded sociological speculations," and the ALJ misunderstanding the VE to have said that the claimant *could* do sedentary work when the VE actually said she *could not* do sedentary work.  *Id.*  There are no such errors here.  Rather, Claimant presents a handful of minor qualms regarding the ME's evaluation that fall far short of being "serious mistake[s] or omissions."  *Id.*  at 309.

The opinion of a treating source, such as Dr. Zabiega, may be rejected based on non-examining medical opinions and other relevant medical evidence from the record. *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006). Because the ALJ relied upon objective medical evidence and clearly and comprehensively explained his rationale, the ALJ did not improperly deny controlling weight to Dr. Zabiega's opinions. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). Furthermore, the ALJ was justified in giving substantial weight to the opinions of the ME, and other non-examining sources, which he amply supported with evidence in the record. *See* 20 C.F.R.§ 404.1527(f)(2)(iii).

**B.     The ALJ Properly Considered Claimant's Combination of Impairments**.

Claimant further contends that the ALJ did not properly consider the aggregate effect of Claimant's ailments, including those impairments that, in insolation, are not severe. In support of this argument, Claimant cites *Golembiewski v. Barnhart*, 322 F.3d 912 (7th Cir. 2003), and *Clifford v. Apfel*, 227 F.3d 863 (7th Cir. 2000). In each of those cases, the ALJ ignored a significant compent of the claimant's condition. In *Golembiewski*, the ALJ "entirely failed to discuss Golembiewski's bowel and bladder dysfunction . . . [his] limited ability to bend . . . [and his] propensity to drop objects because of tingling in his hands." 322 F.3d 912 at 917-918. In *Clifford*, "the ALJ failed to consider at step three the disabling effect of Clifford's weight problem on her overall condition." 227 F.3d 863 at 873. Here, the significant ailments suggested by the Claimant *were* considered by the ME in determining Claimant's RFC. In fact, during the hearing, the ALJ asked the ME "[take] all of these [ailments] *together in combination*" when considering whether there was the equivalent of

a listing. R. 30 (emphasis added). Claimant contends that the matter of "pain," in particular, was not properly considered; this topic is discussed further below.

**C.    The ALJ's Credibility Finding  Was Not "Patently Wrong."**

When faced with a claimant alleging subjective pain symptoms, an ALJ evaluates the credibility of a claimant's testimony about his pain. SSR 96-7p. The ALJ must consider the testimony in light of the entire record and be "sufficiently specific" as to the reasons for his credibility determination. *Id.* Since the ALJ is in the best position to observe witnesses, however, his credibility finding will not be overturned as long as it has some support in the record. *Dixon v. Massanari*, 270 F.3d 1171, 1178-79 (7th Cir. 2001). An ALJ's credibility determination will be reversed only if the claimant can show it was "patently wrong." *Herr v. Sullivan*, 912 F.2d 178, 182 (7th Cir. 1990). A lack of medical testimony in the record supporting a claimant's subjective complaints of pain may be probative of a claimant's credibility. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).

Here, the ALJ addressed Claimant's testimony regarding the "intensity, persistence and limiting effects" of his symptoms and did not find it to be credible. R. 70. The ALJ noted that the record "does not reflect the type of medical treatment one would expect for [an individual] . . . with symptoms as alleged by the claimant." *Id.* The ALJ noted that "contrary to [Claimant's] testimony before me, none of his treating sources indicated that they would view surgery as an appropriate treatment option." R.72. Despite Claimant's continued contentions otherwise, the ALJ is correct, as no doctor–including Dr. Zabiega–actually recommended surgery.[4] Claimant noted that the course of his treatment, which the ALJ found to be "best described as conservative and limited in nature and scope," may in part be due to his financial and insurance circumstances. R. 70. This consideration–acknowledged by the ALJ in his decision–does not change the fact that Claimant's record shows "minimal objective and diagnostic findings, particularly with regard to the claimant's alleged degenerative disc disease of the cervical and lumbar spine." *Id.*

"Applicants for disability benefits have an incentive to exaggerate their symptoms, and an administrative law judge is free to discount the applicant's testimony on the basis of other evidence in the case." *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006). Here, the ALJ gave a highly detailed analysis of the record, including Claimant's treatment history from the alleged disability onset date. R. 70-74. The ALJ even considered medical evidence

_____

[4]Dr. Zabiega merely noted that Claimant might consider seeking evaluation from orthopedic and hand surgeons "to see if he would benefit" from injections or surgery and could potentially need "possible surgery in the future." R. 533, 623.

submitted following the hearing, including MRIs of the cervical spine and the lumbar spine performed on February 13, 2008. R. 604-5, R. 606-7. Furthermore, there is evidence in the record suggestive of past credibility issues involving Claimant's self- evaluation of pain. When Claimant went to Monongalia General Hospital complaining of lower back pain and difficulty walking in February 2006, Dr. Bharti noted that he did not "know how real" the lower back pain was. R. 344. When Claimant saw Dr. Douglas in September 2006, Dr. Douglas found Claimant exhibited "exaggerated pain behaviors." R. 453.

In light of the various factors that contributed to the ALJ's credibility determination, the Court cannot say that the judgment is "patently wrong." Therefore, the ALJ's credibility determination is upheld.

## IV. CONCLUSION

**For the reasons set forth in this opinion, the Court denies Claimant's motion for summary judgment and grants the Commissioner's cross-motion for summary judgment.**

**SO ORDERED THIS 22nd DAY of FEBRUARY, 2010.**

_____
**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**

**Copies sent to:**

Ellen C.  Hanson
Hanson and Hanson Attorneys at Law, P.C.
1802 N. Division Street, Suite 304
P.O. Box 825
Morris, IL 60450

Counsel for Plaintiff

Michele M.  Fox
Assistant United States Attorney
219 South Dearborn Street
Chicago, IL 60640

James Hail
Assistant Regional Counsel
200 West Adams Street, Suite 3000
Chicago, IL 60606